CHARLES BALDASSARIS ET AL. *v.* JOHN J. EGAN, ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS AND DICKENSON, JS.

Argued June 9—decided August 2, 1949.

*Frank R. Odlum,* for the appellants (plaintiffs).

*Wallace W. Brown,* for the appellee (defendant Arrow-Hart & Hegeman Electric Co.)

BROWN, J.   This is an appeal from the denial, by a panel of three unemployment commissioners function-

ing under statutes now incorporated in General Statutes, Rev. 1949, § 7514, of the plaintiffs' claims for unemployment compensation. The Superior Court sustained the commissioners and the plaintiffs have appealed to this court. We shall refer to the Arrow-Hart & Hegeman Electric Company, which was the plaintiffs' employer, as the defendant. In the view which we take of the case, the question decisive of the appeal is whether upon the facts found the refusal of the plaintiffs to continue their employment in the defendant's factories because they declined to cross a picket line maintained by other employees as members of a union to which the plaintiffs did not belong rendered them ineligible for benefits under General Statutes, Cum. Sup. 1939, § 1339e (b) (3) (A) (Rev. 1949, § 7508 [3] [a]).

Upon the record, the facts found by the commissioners stand undisputed. The defendant claims that certain of these facts established conduct by the plaintiffs which, though not constituting a strike, was designed to enforce demands for increased wages and paralleled activities undertaken for a similar purpose by the employees belonging to the striking union. We summarize only the facts material to the question stated above. The defendant manufactures electrical equipment in its plants in Hartford and is an employer under the Unemployment Compensation Act. For some years an electrical workers' union had bargained with the defendant for all production employees, and a machinists' union for the toolroom employees and machinists. As the result of an election in 1945 supervised by the national labor relations board, the former union became the duly certified bargaining agent for the approximately 1200 production workers of the defendant, whether members of the union or not. Included among these were the plaintiffs. The ma-

chinists' union held a bargaining position with the defendant for approximately 130 machinists and toolroom employees, all of whom belonged to that union. From September until early November, 1945, it had been negotiating with the defendant in connection with its demands for increased wages and changes in conditions of employment for its members. The defendant failed to accede to its demands and on November 12, 1945, the employees represented by the union left their work and established picket lines around the defendant's plants.

The next day a substantial number of the 1200 production employees upon arriving for work found that picket lines were being maintained. No attempt was made by any of them to enter the plants that morning. The picketing at that time was very orderly, consisting of a daily total of about 45 pickets from the 130 members of the machinists' union. Four or five pickets were stationed at each of the entrances. The machinists and toolroom employees, most of whom were between fifty and fifty-five years old, continued to maintain similar or smaller picket lines during the balance of the strike, which ended January 12, 1946. At no time were they disorderly or hostile. Throughout the strike the office force, maintenance workers and eighteen of the thirty engineering department employees crossed the picket line daily, and after the first two weeks the other twelve engineering department employees did also. There was no hostility, violence or injury to any of those who crossed the picket lines and worked during the strike. When the electrical workers' union inquired of the defendant's officials regarding police protection in the event production workers crossed the picket lines, they stated that because of the limited size of the picket lines and the orderly nature of the picketing they felt that such pro-

tection was unnecessary, but that it could be furnished if production workers crossed the picket lines. However, the production workers who reported to the plants between November 13, 1945, and January 12, 1946, made no attempt to enter, though they outnumbered the striking employees by about ten to one. The refusal to enter was due primarily to their unwillingness to violate the union principle against crossing a picket line, and secondly, as stated in the commissioners' finding, "to an expressed subjective fear of violence if an attempt were made to cross the lines and enter the plants," though their union representatives told the defendant upon the termination of the strike that they had "remained away only because there were picket lines around the plants." The plants were heated and kept open while the picket lines were maintained, and employment could and would have been furnished for production workers, although there would have been some interference with the manufacture of certain products. The plaintiffs, while unemployed subsequent to November 12, 1945, filed a series of claims for unemployment compensation. The commissioners concluded that the plaintiffs were participating in a labor dispute and that therefore under § 1339e (b) (3) (A) they were not entitled to compensation.

It is the purpose of the Unemployment Compensation Act to guard against involuntary unemployment within the limitations prescribed. The act does not afford benefits for unemployment which is voluntary. § 1339e (b); *Walgreen Co.* v. *Murphy*, 386 Ill. 32, 36, 53 N. E. 2d 390. Section 1339e, in so far as applicable to the question before us, provides: "(b) Disqualifications. An individual shall be ineligible for benefits . . . (3) during any week in which it shall be found by the administrator that his total or partial unem-

ployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or has been employed, provided the provisions of this subdivision shall not apply if it shall be shown to the satisfaction of the administrator that (A) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work. . . ." That the plaintiffs' unemployment was due to a stoppage of work because of a labor dispute at the defendant's plant is not disputed. The question therefore is whether the plaintiffs' refusal to cross the picket lines under the circumstances which existed constituted participation in this labor dispute.

The plaintiffs' claim, as we understand it, is that their unemployment was not voluntary, but involuntary, because their refusal to cross the picket lines was due to "the twin fear of bodily harm and the dishonor that flows" from violating the "principle of every laboring man" that he should not "cross a picket line." There is authority that, in deciding whether refusal by a nonstriker to cross a picket line constitutes participation in a labor dispute, a distinction is to be drawn between a situation where violence amounting to a threat of physical harm is involved and one where it is not. Thus the Court of Appeals of Maryland held in a case where no real fear of violence was involved that refusal by claimants to cross picket lines constituted participation in the labor dispute and rendered them ineligible for unemployment compensation. *Brown* v. *Maryland Unemployment Compensation Board,* (Md.) 55 A. 2d 696, 701. In the case of *Steamship Trade Assn. of Baltimore, Inc.* v. *Davis,* (Md.) 57 A. 2d 818, 820, on the other hand, where the refusal of the claimants to cross picket lines was

because of genuine fear of physical violence, the court reached a contrary result. Referring to the basis of the distinction, the court said: "The courts must presume that strikers are law abiding. There must be more than a mere theatrical threat of violence. The fear of violence must be real and not nebulous. Just because claimants say that they are afraid of the pickets is not enough and the mere presence of the pickets is not enough to excuse claimants from crossing picket lines." Whether we would hold employees entitled to compensation in a case where there was a threat of violence we have no occasion to decide, for the undisputed facts in the present case show conclusively that the crossing of the picket lines could not have involved any real and genuine fear of violence upon the part of the plaintiffs.

Upon authority as well as principle, the refusal of these plaintiffs to cross the picket lines rendered them ineligible for compensation under the statute. *In re St. Paul & Tacoma Lumber Co.,* 7 Wash. 2d 581, 595, 110 P. 2d 877; *Andreas v. Bates,* 14 Wash. 2d 322, 339, 128 P. 2d 300; *Bodinson Mfg. Co. v. California Employment Commission,* 17 Cal. 2d 321, 327, 109 P. 2d 935; *Brown v. Maryland Unemployment Compensation Board,* supra. As was pointed out in the first case just cited, "It is obvious that such a refusal does constitute participation, since, by so refusing to work, the persons are adding their strength to the cause of the strikers, who are then put in a better bargaining position when the entire plant is shut down than when their branch of it has stopped only a portion of the operations."

In so far as any fear in the plaintiffs incident to violating the laboring man's principle of refraining from crossing a picket line is concerned, these further words

of the court in the opinion just quoted are apropos:
"The mere fact that the passage through the picket
lines was contrary to their union convictions was not
enough to make their refusal involuntary, since they
had a legal right to pass the lines if they so desired."
And, as was stated by the court in the *Bodinson* case,
supra, "They were unemployed solely because, in ac-
cordance with their union principles, they did not
choose to work in a plant where certain of their fellow
employees were on strike. Their own consciences and
faith in their union principles dictated their action.
This choice is one which members of organized labor
are frequently called upon to make, and in the eyes
of the law this kind of choice has never been deemed
involuntary."

The commissioners could properly conclude that the
plaintiffs were not entitled to compensation because
by the terms of the statute their voluntary participa-
tion in the labor dispute at the defendant's plant ren-
dered them ineligible for benefits. That this conclusion
was a proper one may be better appreciated if the pur-
pose of the statute is kept in mind. A statement of
the Maryland court as to the statute of that state is
true of our statute: "The purpose of the statute was
to alleviate the consequences of involuntary unemploy-
ment. It was not intended to penalize or subsidize
either employees or employers, lawfully engaged in a
labor dispute. It was not intended to compel striking
workmen to remain without its benefits longer than
their own action made necessary. Nor was it intended
to compel employers to finance their employees in a
strike against them. It was not concerned at all with
labor disputes, except in so far as it became necessary
to consider them in deciding when unemployment was
voluntary and when it was involuntary." *Saunders*

v. *Maryland Unemployment Compensation Board,*
(Md.) 53 A. 2d 579, 581.

There is no error.

In this opinion the other judges concurred.