### Yale and Towne Manufacturing Company v. Walter H. Lanyon et al.

Superior Court          Fairfield County          File No. 74371

Memorandum filed August 11, 1949.

*Cressy, Bartram, Melvin & Sherwood*, of Stamford, for the Plaintiff.

*Buckley & Hanna*, of Stamford, for the Defendants.

QUINLAN, J. This is an appeal from an unemployment commission of three by the plaintiff employer against defendant claimants appearing in the attached schedule to the findings of fact and decision of the commission from a potential merit rating change against the plaintiff's account. The length of time that has transpired between the submission of the matter orally and the present date is not due to the court. Briefs were to be filed and during the intervening period have been promised several times by the defendant's attorneys and to date none have been received. By stipulation it must now be disposed of. It should be said, also, that a decision pending in our Supreme Court came to the attention of counsel and it was desired that the disposition of that case be awaited. That has, also, occurred and will be cited in this memorandum.

A considerable body of facts must be detailed because of the involved situation from which the controversy arose, as well as because, in the view the court takes, there seem to be two periods of activity at the plaintiff plant which call for different treatment.

The plaintiff is a manufacturing corporation organized in 1868. It has been and is a subject employer under the Connecticut Unemployment Compensation Act. For some time before 1941 the Yale and Towne Employees' Association represented all of the workers of the company for bargaining purposes. Between 1941 and 1943 certain groups of employees organized as affiliates of the American Federation of Labor, and these affiliates received certifications from the national labor relations board. As a result of these certifications, eligible employees, with the exception of certain clerical workers, were represented for bargaining purposes concerning wages, hours and other conditions of employment as follows: Approximately 125 employees engaged in polishing, plating and buffing were represented by the Metal Polishers, Buffers, Platers and Helpers International Union, Lodge 23, (hereinafter referred to as Local 23); approximately 185 production and maintenance employees in the mechanical equipment department were represented by the International Association of Machinists, Lock City Lodge 1557 (hereinafter referred to as Local 1557); and the balance of approximately 2500 production and maintenance employees were represented by International Association of Machinists, Lodge 539 (hereinafter referred to as Local 539), all lodges being affiliated with the American Federation of Labor.

On March 21, 1944, the company entered into individual agreements with Local 1557 and Local 539. On March 22, 1944, an election was conducted to determine bargaining representation for approximately 400 office and clerical employees. The issue in the election was whether these employees should be represented by an affiliate of the American Federation of Labor or no union, the Employees' Association on that date having ceased to exist. By a substantial majority the affiliate of the American Federation of Labor was elected as the bargaining representative for this group of employees. On March 31, 1944, the American Federation of Labor Office and Clerical Workers Union, Local 23555, subsequently known as the Office and Clerical Workers Union, Local 90, American Federation of Labor (hereinafter referred to as Local 90) was certified by the national labor relations board as the bargaining agent for the clerical employees for the purpose of bargaining with respect to wages, hours and other conditions of employment. By the terms of this certification, this union represented all typists, stenographers, proofreaders, blue print operators, office messengers, room clerks, expediters, chemical department employees, export department clerks, price bureau clerks and timekeepers, but not confidential secretaries, dental hygienists, nurses, tool designers, salesmen, methods engineers, product designers, time study men, production, maintenance and shipping employees, or supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees or effectively recommend such action, for the purposes of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment. The defendant and all others on the schedule attached to finding of the commission come within the included classifications.

On September 14, 1944, the company entered into a contract with Local 90, and on March 21, 1945, entered into a contract with Local 23. These contracts and the contracts between the company and Locals 539 and 1557, both dated March 21, 1944, all contained provisions that they should remain in effect for one year and be automatically renewed from year to year unless thirty days prior to the termination of any yearly period either party should serve upon the other written notice of a desire to make a change, and each of the four contracts likewise provided against strikes, suspensions of work, slowdowns, lockouts or interruptions during the terms of the

individual agreements, except under conditions not pertinent to the issue. An additional pertinent provision of each contract recognized the individual local as the exclusive bargaining agent for the classification of employees listed in its particular certification by the national labor relations board.

In accordance with the provisions of their agreement, a letter was received on August 14, 1945, by the company from Local 90 insisting, in addition to other demands, upon a 30 per cent increase in wages and a closed shop. The receipt of this letter prevented the contract between them from being automatically renewed on September 14, 1945. During September, these negotiations continued and Jerome Y. Sturm took part in said negotiations as the attorney for Local 90. Prior to September of 1945 negotiations were carried on between Local 539, Local 1557 and the company regarding changes in their respective agreements. The negotiations were not successful and on September 19, 1945, the officers of Locals 539 and 1557 submitted a list of demands with an ultimatum in the event they were not accepted by a certain time. On September 21, 1945, in protest of the delay in negotiations and because of the company's failure to pay back wages resulting from job evaluation adjustments, some production employees left their work. On September 24, 1945, the company cancelled its agreements with Local 539 and ceased negotiations, and on the following day the employees who had walked out on September 21 returned to work. Two subsequent meetings were held between the company and officials of Locals 539 and 1557 in an attempt to settle the disputed issues, the last meeting being on October 5, 1945. No progress was made at these meetings and the two locals took the proper steps necessary to hold a strike vote. During this period two meetings were held between the company and Local 90, one on September 28 and the other on October 1. As a result of these two meetings and one held on November 2, 1945, all issues between Local 90 and the company were satisfactorily adjusted with the exception of the question of a closed shop and a 30 per cent increase in wages. Said Jerome Y. Sturm acted as attorney for Local 90 and participated in these negotiations.

After the work stoppage of September 21, 1945, by production workers, the differences between the company and these workers were a matter of common knowledge to all employees of the company, including the office workers. These differences were mentioned in several newspaper articles, which papers had

a circulation in Stamford. Said differences were also mentioned in frequent statements made over the radio during this period. By one or another of the aforesaid means, most of the members of Local 90 were aware on or before October 24, 1945, that serious differences existed between the Yale and Towne management and many of its production employees, with the possibility that a strike by production workers might result. On October 24, 1945, at a regularly called meeting of the members of Local 90, attended by between forty and sixty members, a resolution was adopted providing that the local looked with disfavor upon any person crossing a picket line which was or might thereafter be established and maintained by any local affiliated with the American Federation of Labor. At a subsequent meeting a motion to send a copy of this resolution to the membership of Local 90 was lost.

Locals 539 and 1557 voted on November 5, 1945, to strike and on November 17 2500 employees of these two locals walked out. At about 11:00 a. m. of the same day the employees represented by Local 23 walked out, although their contract with the company still had some time to run. The employees represented by Locals 1557 and 539 who walked out paraded around the plant and then formed picket lines at the north and south gates of the company plant. Although there were some five entrances to the plant, only two gates were in fact used by employees, the north gate being the factory employees' entrance and the south gate being the so-called office entrance. Approximately 400 pickets formed at the office entrance, forming practically a solid mob. They made uncomplimentary and threatening remarks to those in the plant and to any who made an attempt to enter the factory. At noon the office employees were advised by the president of Local 90, and in some cases individuals were advised by their superiors, that they should not leave their work for lunch because if they left it was doubtful if they could return. Some left for lunch and did not return. Late in the afternoon the clerical employees were advised that they would be allowed to cross the picket line at 4:55 p. m. When they left and crossed the line at the stipulated time, they were notified by the pickets that it was their last day of work.

When clerical employees reported at the plant on November 8, mass picketing was in effect at the gates and large crowds of people were congregated in the streets. Clerical employees represented by Local 90 who reported for work on this morning

did not attempt to cross the picket line because of a fear of bodily harm from the pickets. Foremen who had been advised by officials of the company not to use force in attempting to cross the line because of the danger of inciting violence could not get through the pickets on that day. Up to and including December 6, mass picketing and a tense situation prevailed.

In the foregoing statement, facts are incorporated which were based on the motion to correct the finding and granted by the commission with the additional facts of the representation of Mr. Sturm, in behalf of Local 90. Because I have arrived at a conclusion upon this statement of facts in accord with the commission as to the period between November 7 and December 6, it seems desirable to state the question involved in the appeal. It is whether upon the facts found the refusal of the defendants to continue their employment in the plaintiff's plant because they declined to cross a picket line maintained by other employees as members of the union to which the defendants did not belong rendered them ineligible for benefits under General Statutes, § 7508 (3) (a). I don't think even the plaintiff is inclined to disagree with the conclusion that the defendants' unemployment during that period of time was involuntary because whatever their union's convictions may have been their reluctance to pass the picket line was because of genuine fear of physical violence. *Steamship Trade Assn. of Baltimore, Inc.* v. *Davis,* (Md.) 57 A. 818, 820. It is true that the Connecticut case, *Baldassaris* v. *Egan,* 135 Conn. 695, decided this August by our Supreme Court of Errors, refrained from saying "whether we would hold employees entitled to compensation in a case where there was a threat of violence."

December 7 fell on Friday and for the period up to the conclusion of the strike the record seems to me to warrant the addition of several facts to the finding other than those granted by the commission on the motion to correct. My conclusion as to this period might well be supported upon the finding as it stands, in that it does not appear that the conclusions reached are supported by the subordinate facts stated. Close analysis of the finding of the commission from paragraph 32 of its finding to the end thereof shows it to be indefinite and uncertain in many of its aspects and it gives the appearance of a rather studied effort to support a conclusion. This last statement is fortified when one examines the commission's decision on the motion to correct the finding wherein the commission

gratuitously made a change in paragraph 48 which is denominated a correction, changing the word "possibility" to "probability." Accordingly, before referring to the finding as corrected, it should appear what paragraphs of the motion to correct I have or am granting. Before doing so, however, none of the exceptions to the decision as such are or can be corrected. Neither can the conclusions of fact. They may be considered only as reviewable errors in law either because of an incorrect application of the law to subordinate facts or because resulting from interferences illogically drawn from subordinate facts. *Palumbo* v. *Fuller Co.*, 99 Conn. 353, 356.

Paragraphs 3, 4, 18, 19, 20, 21, 22, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35, 37, by substituting the date of December 6 for April 8 and striking the words following "539", 38 and 39 of the motion to correct, are granted.

With these additions it would appear that mass picketing discontinued, that members of Local 90 did not join the picket line but there was an immediate rush by members to present claims for unemployment compensation, that the workers were told that the members of 539 and 1559 were fighting the battle of the office workers, and that members of Local 90 were summoned by the grievance committee and were disciplined, that at the end of the strike the wage demand for the office workers was renewed by the attorney for the other unions and for Local 90, Mr. Sturm, or they otherwise would form a picket line; and that it does not appear that any one was injured or threatened, though as many as 20 per cent of the office workers worked steadily after December 7, and that any fear of violence was not real but merely thoughts held by the members because of the presence of pickets which does not excuse them from crossing the picket line. *Baldassaris* v. *Egan*, supra.

It is further found that the defendants' refusal to cross the picket line under the circumstances which existed constituted participation in this labor dispute and that the unemployment was voluntary and not involuntary and that the conclusions of the commission are neither supported by the subordinate facts as found nor as corrected by the court, after December 6, 1945.

Our Supreme Court of Errors in *Baldassaris* v. *Egan*, supra, quoted from *In re St. Paul & Tacoma Lumber Co.*, 7 Wash. 2d, 581, 595, as follows: "It is obvious that such a refusal does constitute participation since, by so refusing to work, the

persons are adding their strength to the cause of the strikers, who are then put in a better bargaining position when the entire plant is shut down than when their branch of it has stopped only a portion of the operations."

The claimants were entitled to unemployment compensation from November 7 through December 6 and were not so entitled after that date.

The appeal is sustained to the extent indicated and the Unemployment Commission is directed to award benefits in accordance herewith.