ACHENBACH ET AL. *v.* REVIEW BOARD OF INDIANA EMPLOYMENT SECURITY DIVISION ET AL.

[No. 30,206. Filed February 6, 1962. Rehearing denied April 5, 1962.]

*Chester E. Bowman, Jerrald A. Crowell,* and *Bowman & Crowell,* of Fort Wayne, for appellants.

*Edwin K. Steers,* Attorney General, *Frank E. Spencer,* Chief Counsel, and *Keith Campbell,* Deputy Attorney General, for appellee, Review Board.

*Seymour W. Croft,* of Chicago, Illinois, *Ward E. Dildine, David B. Keller* and *Campbell, Livingston, Dildine & Haynie,* of counsel, all of Fort Wayne, for appellee, International Harvester Company.

BOBBITT, J.—This case comes to us on petition to transfer from the Appellate Court under Acts 1933, ch. 151, §1, p. 800, being §4-215, Burns' 1946 Replacement. See: *Achenbach* v. *Review Board of Ind. Emp. Sec. Div.* (1961), 172 N. E. 2d 214, for opinion of the Appellate Court.

The proceeding here was instituted before the Review Board of Indiana Employment Security Division to determine the eligibility of claimant-appellant, Achenbach, and others, for benefits under the Indiana Employment Security Act.[1]

International Harvester Company operates two plants in the City of Fort Wayne, Indiana, one known as the Fort Wayne Works, and the other as the Motor Truck Engineer Division. They are located on separate premises across the street from each other.

On November 13, 1958, the UAW-CIO, Local 57, representing the production workers, and the UAW-CIO, Local 305, representing the office and clerical workers, called a strike at both plants.

Claimants-appellants, and others represented by them, who were members of Local 80 of International Die Sinkers, and Local 1608 of the International Brotherhood of Electrical Workers who worked at the Fort Wayne Works, and those who were members of Local 137 of American Federation of Technical Engineers and worked at the Motor Truck Engineer Division,

---

1. Acts 1947, ch. 208, §101, p. 673, being §52-1525, *et seq.,* Burns' 1951 Replacement.

were not on strike. Members of the first two of these non-striking unions did not cross the picket lines although work was at all times available to each and all of them.

Within the required time these workers belonging to the two non-striking unions whose members refused to cross the picket lines, filed their applications for benefits with the Indiana Employment Security Division stating that they were unemployed because of a labor dispute.

The claims of several applicants for benefits were heard before a referee on March 12, 1959. The referee found that claimants who were members of Local 80 of the International Die Sinkers Conference, Local 137 of the American Federation of Technical Engineers AFL-CIO, and Local 1608 of the International Brotherhood of Electrical Workers, AFL-CIO, were entitled to benefit rights during all of the calendar weeks covered by the duration of the strike.[2]

Appellee, International Harvester Company, appealed this ruling to the Review Board of the Indiana Employment Security Division which, after notice and hearing, issued its decision on September 2, 1959. The pertinent parts of such decision are as follows:

"FINDINGS AND CONCLUSIONS: The Board finds that a stoppage of work existed because of a labor dispute at the employer's establishment during the period from November 13, 1958, to January 19, 1959, and that the unemployment of the claimants during such period was because of the labor dispute.

---

2. This court is not concerned with the findings of the Referee. It is only the decision of the Review Board that is conclusive and binding upon the court and which we must affirm if there is evidence sufficient to sustain it, and not the recommendation of the Referee.

"The Board further finds that the claimants herein, being members of certain unions, refused to cross or attempt to cross picket lines formed by striking employees who were members of another union at each of the employer's two plants in the city of Fort Wayne, Indiana.

"It is further found that said claimants refused to attempt to return to work during the period from November 13, 1958, to January 19, 1959, and that there was work available for each of said claimants during said period of time.

"It is further found that the claimants never requested any protection for the purpose of proceeding through the picket line although the city police were present for the purpose of directing traffic, nor did they seek the aid of the courts for injunctive relief from interference, if any existed, with their right to return to work had they so desired.

. . . . .

"It is further concluded that the claimants were participating in the labor dispute which caused their unemployment by reason of their election to honor the picket line of striking employees and their refusal to make a reasonable attempt to cross said picket line.

"It is further concluded that the evidence is insufficient to bear out the claimants' contention that they would receive bodily harm if an attempt was made to cross the picket line.

. . . . .

"Therefore, it is finally concluded that the claimants, and each of them involved herein, were ineligible for unemployment benefit rights during the weeks in which they were unemployed in the period of November 13, 1958, to January 19, 1959."

From the decision of the Review Board an appeal was prosecuted to the Appellate Court.

The sole error assigned is that the decision of the Review Board of the Indiana Employment Security Division is contrary to law.

The decision of the Review Board as to all questions of fact is conclusive[3] and binding upon the court, and the court will not disturb the decision of the Board unless reasonable men would be bound to reach a different conclusion on the evidence in the record. *Adams et al.* v. *Rev. Bd. Ind. Emp. Sec. Div. et al.* (1957), 237 Ind. 63, 69, 143 N. E. 2d 564; *Board of Medical Registration* v. *Armington* (1961), 242 Ind. 436, 178 N. E. 2d 741; *National Furniture Mfg. Co.* v. *Review Bd. of Ind. E. S. D.* (1960), 131 Ind. App. 260, 170 N. E. 2d 381, 384.

The evidence most favorable to the decision of the Review Board may be summarized as follows:

Two unions, neither of which appellants, nor any persons represented by them, were members, were on strike at both Fort Wayne plants of appellee, International Harvester Company, from November 13, 1958, to January 19, 1959. The strike continued at the Fort Wayne Works from November 13, 1958, to January 19, 1959, and at the Motor Truck Engineer Division from November 13, 1958, to November 25, 1958. The strike resulted from a dispute involving wages and working conditions of members of the striking unions.

"Management employees" and "excluded employees" were employed at both plants and continued to work during the period of the strike, crossing picket lines each day to go to and from their work. Most of these employees carried nothing to identify them as belonging to the "management" or "excluded" group of employees.

There was a common entrance for all employees at each plant.

3. Acts 1957, ch. 299, §6, p. 795, being §52-1542k, Burns' 1961 Cum. Supp.

When appellants, Achenbach, Sills, and other members of International Die Sinkers, Local 80, and members of the International Brotherhood of Electrical Workers, Local 1608, reported to work on November 13, 1958, the first day of the strike, there were pickets at the entrance of both plants.

There is conflict in the evidence concerning the number of pickets on duty at any one time. The Industrial Relations Manager of the Motor Truck Engineer Division testified that there were 15 to 20 pickets at the entrance of that plant. Witnesses for the American Federation of Technical Engineers, Local 137, AFL-CIO, testified that "at times" there were 150 to 200 pickets at the entrance of the engineering plant, for "two or three days" and this was "probably five times" the number at both entrances to the other plant. Two other witnesses for the claimants-appellants testified that the number of pickets decreased after the first day of the strike, and at one time there were only two pickets.

The picketing was, at all times, peaceful. There is no evidence of any violence or threats of violence at either plant during the strike. No pickets were observed carrying weapons of any kind. There were women on the picket line, and at times there were more women than men at the Fort Wayne Works.

A Mr. Sills, who was president of International Die Sinkers, Local 80, and a witness for claimants-appellants, testified that when he and his men approached the picket line on the first shift on the first day of the strike he asked the picket captain if they could cross the line, and the captain replied, "No . . . he wasn't allowing nobody to cross." There is no evidence that this witness or any of the claimants on

any shift insisted upon his right to enter the plant,[4] nor is there any evidence that anyone made any effort to secure the aid of police, deputy sheriffs or plant guards, who were present, in enforcing their right to enter the plant.

The undisputed evidence shows that no reply was made to the picket captain when he said he wasn't allowing anybody through the line. The witness, Mr. Sills, testified, however, that he then turned and walked back across the street where he "waited a while to see if anybody crossed." He saw no one cross and "after a while, the fellows begin to go their ways . . . and it all thinned out", then he went home.

Mr. Sills returned three times the first day when the other shifts were to report and informed the men on each shift that a "strike was on and they wouldn't let us cross the picket line in the morning" and told them to "approach the picket line and see if they could get through."

At each shift, on the first day of the strike, the men were told that they could not cross the picket line and on each occasion they left without making any further effort to cross. The president of the union, Mr. Sills, visited the plant "about 7 times" after the first day and asked someone in the picket line if he could go to work and was refused.[5] Sills was never threatened with injury if he attempted to cross the picket line, nor did he ask any police officer, plant guard or plant representative to assist him, or the

---

4. See: *Blue* v. *State* (1946), 224 Ind. 394, 399, 67 N. E. 2d 377, for right to enter through picket lines.

5. There is no evidence that during the nine weeks the strike was in progress any of the other production workers reported for work after they were told, on the first day of the strike, that they could not cross the picket line.

members of his union, to cross the picket line so they might get to the work which was available to them.

Officers of appellants' unions made no effort prior to the strike to work out an agreement whereby the members of these non-striking unions would be permitted to enter the plants and perform their customary duties. Nor is there any evidence that any members of appellants' unions ever sought from officials of the striking unions permission to cross the picket lines to go to and from their work, and no effort was ever made to work out such an arrangement except one telephone call by Mr. Sills to the president of the striking union asking him "conditions" and if they were going to "allow anybody through." To this question the president answered, "No."

American Federation of Technical Engineers, Local 137, AFL-CIO, were also refused permission to cross the picket line at the Motor Truck Engineer Division on November 13, 1958. However, the president of this Local, through efforts of their International Headquarters, worked out an arrangement with the striking Locals 57 and 305 whereby members of Local 137 were permitted to cross the picket lines and return to work on November 25, 1958.

All managerial employees were at work on the second day of the strike, and all excluded employees on the sixth day.

The only reason given by claimants-appellants for the failure to do more than merely ask permission to cross the picket line was that they thought that the pickets would resort to physical restraint resulting in bodily injury.

We find no evidence in the record to support any fear of bodily harm resulting from an attempt to cross

the picket lines. In fact, there is evidence that some workers, on the first day of the strike, drove their cars through the picket line and into the parking lots without any physical resistance or threats of injury from the pickets.

In our judgment there is substantial evidence to sustain the finding and conclusions of the Review Board.

Although there was evidence that some members of appellants' unions stayed away from work because of fear of physical injury if they crossed the picket line, the Review Board was justified in considering that such fear was not real or genuine in view of the undisputed fact that the picket lines were maintained at all times in a peaceful manner and the engineers, managerial and ungraded employees who crossed the lines every day were not molested or threatened with violence.

It is not necessary that any of appellants should have experienced actual violence or bodily harm in attempting to cross the picket lines, but their fear, in light of all the circumstances must have been reasonable and genuine. The fear of violence must be real and not nebulous or imaginary. *Abshier* v. *Review Bd., Emp. Sec. Div.* (1952), 122 Ind. App. 425, 431, 105 N. E. 2d 902.

A mere verbal refusal by the pickets under the circumstances here is not sufficient to excuse claimants-appellants from crossing the picket lines. They had the legal right to do so but none of them made any attempt to enforce his right, to cross the picket lines, further than to ask permission to do so. As has been hereinabove stated, the picketing was peaceful, and there was no violence or threats of violence.

The Review Board could have properly inferred from these facts that claimants-appellants had no real reason to fear bodily harm if they crossed the picket lines, but such fear, if any, was only imaginary and nebulous. *Meyer* v. *Industrial Commission of Missouri* (1949), 240 Mo. App. 1022, 223 S. W. 2d 835, 840.

The voluntary refusal of claimants-appellants to cross picket lines maintained by members of a union to which they do not belong makes them participants in the labor dispute involved. *American Brake Shoe Co.* v. *Annunzio* (1950), 405 Ill. 44, 90 N. E. 2d 83, 85, 86; *Baldassaris* v. *Egan* (1949), 135 Conn. 695, 68 A. 2d 120, 122.

Voluntary, under such circumstances, includes belief in union concepts and tenets; acquiesence in superior union officers' advice; and actions in concert and support of a striking union.

Involuntary includes actual violence, or the threat of violence, or apparent observation of circumstances at the picket line or elsewhere which would induce a reasonable and genuine belief of violence occurring if a crossing was attempted.

As stated by the Supreme Court of Washington *In re St. Paul & Tacoma Lumber Co.* (1941), 7 Wn. 2d 580, 595, 110 P. 2d 877, 884, "It is obvious that such a refusal does constitute participation, since, by so refusing to work, the persons are adding their strength to the cause of the strikers, who are then put in a better bargaining position when the entire plant is shut down than when their branch of it has stopped only a portion of the operations."

The mere fact that the passage through the picket lines might have been contrary to claimants-appel-

lants' union convictions and beliefs was not sufficient "to make their refusal involuntary, since they had a legal right to pass the lines if they so desired." *In re St. Paul & Tacoma Lumber Co., supra,* at page 595 of 7 Wn. 2d, page 884 of 110 P. 2d.

As was so aptly stated in *Bodinson Mfg. Co.* v. *California Employment Commission* (1941), 17 Cal. 2d 321, 109 P. 2d 935, at page 940, the claimants-appellants here "were unemployed solely because, in accordance with their union principles, they did not choose to work in a plant where certain of their fellow employees were on strike. Their own consciences and faith in their union principles dictated their action. This choice is one which members of organized labor are frequently called upon to make, and in the eyes of the law this kind of choice has never been deemed involuntary."

Voluntary unemployment is not compensable under the purpose of the Act, which is to provide benefits for persons unemployed through no fault of their own. *Abshier* v. *Review Bd., Emp. Sec. Div., supra* (1952), 122 Ind. App. 425, 430, 105 N. E. 2d 902.

The Review Board correctly concluded that claimants-appellants were participants in a labor dispute which caused their unemployment and that because of this fact they were ineligible for unemployment benefit rights during the period of the strike.

The judgment of the Review Board is affirmed.

Jackson, J., concurs.

Achor, C. J., concurs with separate opinion.

Arterburn, J., dissents with opinion in which Landis, J., concurs.

CONCURRING OPINION

ACHOR, C. J.—A decision in this case rests upon two primary considerations. *One:* The judicial review by the Appellate Court and this court is from the Employment Security Board which denied compensation to the claimants, and not from the opposite conclusion of the referee. *Two:* Our decision, in review of the action of the Employment Security Board, must uphold the decision of that administrative board, unless the evidence in the case leads inescapably to a contrary conclusion. *Warren* v. *Indiana Telephone Co.* (1940), 217 Ind. 93, 118, 26 N. E. 2d 399, 409; *Merkle* v. *Review Bd. Emp. Sec. Div.* (1950), 120 Ind. App. 108, 111, 90 N. E. 2d 524, 525; *Hollingsworth Tool Works* v. *Rev. Bd. Emp. Sec. Div.* (1949), 119 Ind. App. 191, 193, 84 N. E. 2d 895, 896; *Wabash Valley Electric Co.* v. *Young* (1932), 53 S. Ct. 234, 237, 238, 287 U. S. 488, 499-500, 501, 77 L. Ed. 447, 455, 456.

Does the evidence lead to the conclusions as a matter of law that appellants were barred from their employment by threat or fear of violence? In determining this question, the board was entitled to take into consideration the following facts which were in evidence: (1) Prior to, and in anticipation of the strike, the president of the striking union and the presidents of the non-striking unions met in conference. At this meeting it was orally stated that the non-striking union employees would not be permitted to cross the picket line. (2) Also, prior to, and in anticipation of the strike, a meeting of the union of which appellants are members, was called and the members of the union were "all aware" that in order to make themselves eligible for unemployment benefits they should *"approach"* the picket line. (3) On the first day of the strike there was considerable con-

gestion about the entrance to the plant by members of the striking union, non-union members appearing for work, and general spectators. It is estimated that on two or three days there may have been 100 to 200 strikers and perhaps 15 or 20 at another time. There is no evidence of "mass picketing," except on these two or three days. (4) At the outset of the strike several of the appellants did "approach" the pickets and asked if they could cross the picket line. Although they were answered in the negative, at no time does it appear that appellants insisted upon their right to cross the picket line, nor did they inquire as to whether their entrance would be resisted by force. (5) Although police officers were present for the purpose of directing traffic, their assistance was not requested for the purpose of their peaceful admission to the plant. (6) Neither did appellants ask any assistance from their employer in obtaining entrance for the purpose of resuming their employment. (7) Although the strike continued for a period of more than nine weeks, there is no evidence that any attempt was actually made thereafter by appellants to cross the picket line and report for work, except that an officer of their union, on about seven occasions, inquired of the pickets and the president of the striking union as to the status of the negotiations and whether members of the non-striking union employees would be admitted to the plant. (8) Throughout the strike there was no evidence of threats of violence, nor were there any acts of actual violence related to the strike itself. The only incident which might be described as violence involved contact by an automobile with a picket which could be characterized as an act of negligence.

The above circumstances presented an issue of fact as to the voluntary or involuntary character of ap-

pellants' employment, the decision of which was the responsibility of the Employment Security Board. I submit that under the facts presented, although some persons might conclude that appellants were barred from their employment by fear of violence, the evidence does not lead inescapably to this conclusion as a matter of law. Other persons might with equal reason conclude from the same evidence, as did the board, that (1) the pickets merely engaged in the normal and peaceful practice of persuading the claimants not to enter upon their employer's premises; (2) that appellants did not make a reasonable effort, personally or with the aid of law enforcement officers or of the courts, to gain access to their jobs and as responsible individuals earn the compensation for which they now seek payment from their employer, and that under these circumstances their employment was not involuntary, within the meaning of the law.

The legislature has placed the responsibility of resolving the issue before us with the Employment Security Board. Acts 1957, ch. 355, §3, p. 1033 [§63-3010, Burns' 1960 Cum. Supp.].

Under the circumstances here present, we cannot say that the decision of the board was arbitrary, capricious or an abuse of discretion and that a contrary conclusion is required as a matter of law, under the provisions of the controlling statute. Acts 1947, ch. 365, §18, p. 1451 [§63-3018, Burns' 1951 Repl.].

It occurs to me that the evidence in this case does not lead inescapably to a conclusion contrary to that of the board. Cf. *Wabash Valley Electric Co.* v. *Young* (1932), 53 S. Ct. 234, 237, 238, 287 U. S. 488, 499-500, 501, 77 L. Ed. 447, 455, 456, *supra.*

Therefore, in my opinion the decision of the board must be affirmed.

## DISSENTING OPINION

ARTERBURN, J.—The question here is whether or not the appellants' unemployment was involuntary or voluntary. The facts show without dispute that appellants were *not* members of the union that was striking at the plants at which they were employed. There is *no evidence that they* sympathized with or cooperated with the strikers and pickets who were strung across the entrance of the plant to which the appellants desired entrance in order to continue their employment.

The evidence does show that the pickets across the entrance of the plant through which the appellants would have been required to pass, ranged from time to time from twenty to two hundred or more. At the time appellant's work "shift" began, they approached the picket line to see if they could get through and asked if they could cross the line. The evidence shows the answer was "No, . . . he wasn't allowing nobody to cross." The appellants waited a little while to see if anybody crossed the line; they saw no one go through and later left. Men from each shift on the first day attempted to go through the line but were denied the right. This occurred about seven times thereafter on succeeding days. The president of the striking union was even called by telephone to see if the appellants could go through the line, and his answer was "no". The evidence shows that no production and maintenance employees were allowed through the line.

The majority opinion refers to the fact that some workers on the first day of the strike "drove their cars through the pickets and into the parking lot." This referred to management employees, but it is significant

that even in that case, an automobile had to be used and the pickets "banged" on the side of the cars. The police, when cars were stopped at the entrance, insisted that the driver move on down the street.

The testimony in part is as follows:

"A. I normally report for work about twenty minutes past 7:00 and that particular morning, in order to drive one block, why it took about an hour, so it was approximately in the neighborhood of twenty after 8:00 when I got to the gate entrance. It was impossible to park or impossible to drive in, and the sheriff was standing there and kept motioning you on. You couldn't go any place.

"Q. Did you attempt to drive—turn in the parking lot?

"A. Yes.

"Q. Did—

"A. (Continuing) You just couldn't do it—so many of them.

"Q. And so the sheriff didn't leave you turn?

"A. No, sir. Motioned to go on."

Further testimony by this same witness:

"A. There were some threats. At one particular time one man did go—drive through the picket line and bumped, or knocked into one of the pickets and injured him. The man happened to be Howard (phonetic) 'Minier', who was injured in the leg where one of the cars hit him.

"Q. You mean hit one of the pickets with his car?

"A. Yes, and right about that time why the picket line was pretty tough and I don't think anyone wanted to take a chance getting hurt or injured, although they made no direct threats, they were mad enough to.

"Q. You say they were mad?

"A. They were mad.
One man in the course of going in, instead of going down the street, he shot up on the sidewalk and around in order to get into the plant and I don't believe it is necessary to enter in that way where you have to."

The Appeals Referee found that the appellants

". . . did not voluntarily stop working because of sympathy with the striking union during the period of the work stoppage and labor dispute beginning November 13, 1958 and ending January 19, 1959. It is held that they were forceably restrained from working due to the mass picketing and that they had good grounds to fear an attempt to cross the picket lines."

The majority opinion is not realistic. It should not be necessary, in order to establish an involuntary unemployment where picketing exists, that the employee actually use force to push aside pickets in order to get through the picket line, nor should it be necessary to use an automobile to break through the line. The majority opinion says that there was no evidence that any of the pickets were carrying weapons. Fear may be instilled and threats can be made without weapons and even without words.

It is no answer to say that "they had the legal right" to cross the picket line. The question is—could they have done so without physical contact with the pickets and without being put in fear of harm for themselves, their families and property? I do not believe the law requires that a workman, who is not a member of the striking organization, subject himself to such risks in crossing a picket line in order to show that his unemployment is involuntary, after he has asked to go through and been told he cannot by

pickets who are actually blocking the entrance and maintaining an effective blockade.

Landis, J., concurs in dissent.

NOTE.—Reported in 179 N. E. 2d 873.