381 N.E.2d 888 (1978)
Eddie C. THOMAS, Appellant,
v.
REVIEW BOARD OF THE INDIANA EMPLOYMENT SECURITY DIVISION, William H. Skinner, J. Frank Haley, and Ralph Miles, As Members and As Constituting the Review Board of Indiana Employment Security Division, and Blaw-Knox Foundry & Machinery, Inc., Appellees.
No. 2-1276A491.
Court of Appeals of Indiana, In Banc.
October 26, 1978.
Rehearing Denied November 22, 1978.
*889 Janet L. Jannusch, Andrea K. Knish, Gary, for appellant.
Theodore L. Sendak, Atty. Gen., Darrel K. Diamond, Deputy Atty. Gen., Indianapolis, for appellees.
SULLIVAN, Judge.
Eddie C. Thomas appeals from a decision of the Employment Security Review Board (the Board) denying his claim for unemployment compensation. The relevant facts are not in dispute and disclose that Thomas voluntarily terminated his employment for religious reasons. Thus, the reason for termination is not in dispute and is inextricably tied to First Amendment considerations.
In affirming the referee's decision, the Board adopted "by reference" the referee's Findings and Conclusions as follows:
"FINDINGS AND CONCLUSIONS: The claimant worked for this employer for approximately one year concluding his employment on November 6, 1975. The claimant worked for this employer as a chainman `hooker' and received approximately $4.52 per hour as remuneration for his services. The uncontradicted evidence indicates the claimant did voluntarily leave his position after requesting a layoff from the company. The evidence reveals that the claimant on his initial application form for employment indicated a religious belief of Jehovah Witness, and indicated his hobbies to be bible studying and bible reading. Claimant, upon the recommendation of another Jehovah Witness, was hired especially into the `Roll Foundry' where claimant performed as a satisfactory employee. The evidence reveals that approximately two to three weeks prior to the claimant's date of leaving, the `Roll Foundry' was closed permanently and claimant was transferred to the terret [sic] line. Claimant, at this time, realized that all of the other functions at The Blaw-Knox company were engaged in producing arms for the Armament Industry. *890 Claimant's religious beliefs specifically exempts [sic] claimant from producing or aiding in the manufacture of items used in the advancement of war. Claimant continually searched for a transfer to another department which would not be so armament related; however, this did not materialize, and prior to the date of his leaving, claimant requested a layoff, which was denied; and on November 6, 1975, claimant did quit due to his religious convictions. The evidence further reveals that the other Jehovah Witness, who claimant used as a reference to gain his job, continued to work for the Blaw-Knox company in spite of his armament producing capability, and found a less strict interpretation of the Jehovah Witness principles, which claimant could not morally accept. The referee notes the claimant did not, knowing his special circumstances, seek out information concerning the Blaw-Knox company and its armament producing functions prior to his employment."
"From the foregoing findings it is concluded that the claimant did voluntary leave his position on November 6, 1975. It is further concluded by the referee that the claimant has the burden of going forward and establishing good cause in connection with the work, and that the claimant has not done so in this case. It is the conclusion of the referee that it was the claimant who placed special restrictions on his working capabilities, and that it was also the claimant who sought out the job at Blaw-Knox, not the employer who sought out the claimant; therefore, the employer hired the claimant in spite of his special circumstances. The action of the company leaves the referee with the conclusion that the claimant wanted to work for this employer when the claimant knew of his special circumstances and yet, in light of that, still requested employment whereupon the employer did grant set employment. Therefore, the referee finds no logic to the proposition that the employer in anyway contributed to the claimant's voluntarily leaving thereby establishing good cause in connection with the work. Therefore, the referee concludes, the claimant did voluntarily leave his employment without good cause in connection with the work." (Emphasis supplied).
We are squarely presented with the question whether the disqualifying provision of the Indiana Statute, I.C. XX-X-XX-X (Burns Code Ed. 1974),[1] violates Thomas' First Amendment guarantee to the free exercise of his religion.[2]
Thomas places principal reliance on Sherbert v. Verner (1963) 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 and Lincoln v. True (W.D.Ky. 1975) 408 F. Supp. 22 to support his claim for benefits.
In Sherbert, a Seventh Day Adventist, unable to find employment because of her conscientious scruples against Saturday work, filed a claim for unemployment benefits. The South Carolina Employment Security Commission denied her claim on the basis that she failed, without good cause, to accept otherwise suitable work. The state Supreme Court affirmed that decision and Sherbert appealed to the United States Supreme Court, contending that the disqualification abridged her First Amendment right to the free exercise of religion.
The Supreme Court analyzed Sherbert's claim in the following context:
"Plainly enough, appellant's conscientious objection to Saturday work constitutes no conduct prompted by religious principles of a kind within the reach of state legislation. If, therefore, the decision of the South Carolina Supreme Court is to withstand appellant's constitutional challenge, it must be either because her disqualification as a beneficiary represents *891 no infringement by the State of her constitutional rights of free exercise, or because any incidental burden on the free exercise of appellant's religion may be justified by a `compelling state interest in the regulation of a subject within the State's constitutional power to regulate... .' NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 341, 9 L.Ed.2d 405." Id., 83 S.Ct. at 1793.
A majority of the Court was of the view that her disqualification imposed a burden on the free exercise of her religion:
"Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." Id., 83 S.Ct. at 1794.
Because the State offered no persuasive "compelling interest" to justify this infringement, the Court held that for constitutional reasons the state was required to exempt her from its Monday through Saturday availability requirement.[3]
The Lincoln case, supra, applied the Sherbert holding in a slightly different context  a context identical to that before us. In Lincoln, the claimant voluntarily terminated her employment with a tobacco company "because elders of Jehovah's Witnesses, a ... sect of which she had been a member for 15 years, informed her that anyone using tobacco or working with tobacco products was violating the Will of God, and unless she resigned, she would be expelled from the fellowship of Jehovah's Witnesses." Id. at 23. The Kentucky Unemployment Insurance Commission denied her claim to benefits, calling her action a voluntary quitting without good cause. The District Court cited Sherbert as controlling and held that the denial of benefits was in violation of the claimant's First Amendment right to the free exercise of her religion and ordered that benefits be paid.
The Board here contends that neither Sherbert nor Lincoln control disposition of the present appeal.
The Board did not address Lincoln in its brief, but during oral argument observed that Lincoln had misstated the holding of Sherbert, on which it relied. It is true that Lincoln erroneously described Sherbert as having been discharged instead of having been "unavailable for work." Accordingly, this distinguishing factor will be hereinafter discussed but its consequence is significant only to the extent that we do not have available a reasoned analysis of the distinction between cases involving "voluntary quit" as opposed to "availability for work" or "discharge."
The Board contends that the distinction between disqualification standards under each statutory provision  between good cause for quitting, I.C. XX-X-XX-X, supra, and good cause for refusing work, I.C. XX-X-XX-X (Burns Code Ed. 1974)  makes Sherbert distinguishable. We agree that the distinction exists and that the standards for entitlement to benefits in a "voluntary quit" case are more strict than those in a "work availability" case. See Gray v. Dobbs House, Inc. (2d Dist. 1976) Ind. App., 357 N.E.2d 900. However, no explanation is offered by the Board why this should preclude application of the Sherbert analysis to Thomas' claim. Indeed, the Board argues merely that there is a distinction and that Thomas' disqualification "was simply a determination that objective, religiously neutral standards were not met."
We think it settled that

*892 "[e]ven as to neutral prohibitory or regulatory laws having secular aims, the Free Exercise Clause may condemn certain applications clashing with imperatives of religion and conscience, when the burden on First Amendment values is not justifiable in terms of the Government's valid aims." Gillette v. United States (1971) 401 U.S. 437, 91 S.Ct. 828, 842, 28 L.Ed.2d 168.
Thomas is challenging the "neutral" disqualifying provisions as they apply to him. If the denial of benefits does not "burden" his free exercise rights, compensation may properly be denied. Cf. Sherbert. But if we discern an infringement of such rights, unemployment compensation must be awarded unless the abridgment is justified by a "compelling state interest." We find no basis in Gray, supra, which precludes such result.
Our task in applying the Sherbert standards to Thomas' claim has been focused by the Board's concession at oral argument that should we find a "burden" on Thomas' free exercise rights, no "compelling state interest" can be offered in justification.
We must therefore examine the question "whether the disqualification for benefits imposes any burden on the free exercise of appellant's religion." Sherbert, supra, 83 S.Ct. at 1794. Though not as "clear" a case as Sherbert, we think that it does impose such burden.
In Sherbert, the claimant was forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, or abandoning one of the precepts of her religion in order to accept work, on the other hand." Id. So, too, Thomas was here confronted with a similarly burden-some choice  either following the precepts of his religion and thereby forfeiting unemployment benefits, or abandoning the precepts of his religion in order to maintain his employment and thereby avoid the adverse economic consequence of benefit denial.
We concede that the burden imposed on Thomas' free exercise rights is less direct than that found in Sherbert. Nevertheless, "[i]f the ... effect of a law is to impede the observance of one or all religions ... that law is constitutionally invalid even though the burden may be characterized as being only indirect." Braunfeld v. Brown (1961) 366 U.S. 599, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563.
Sherbert noted that the decision therein did not establish "the existence of a constitutional right to unemployment benefits on the part of all persons whose religious convictions are the cause of their unemployment." Id., 83 S.Ct. at 1797. Certainly Sherbert's conduct could be said to have been the "cause" of her unemployment. Indeed, the Court stated that Sherbert's ineligibility "derive[d] solely" from her religious convictions. Id., 83 S.Ct. at 1794. Thus, we view Justice Brennan's statements in the majority opinion as a limitation of the Sherbert holding, excluding from its ambit one who feigns religious objections to employment or who may be merely a malingerer seeking sanctuary and economic benefit within the protections of the First Amendment.[4]
It is also true that Thomas' religious beliefs were found by the Board to be the "cause" of his unemployment. Yet like Sherbert, his conduct is not "of a kind within the reach of state legislation." Id., 83 S.Ct. at 1793. Indeed, the Court in Sherbert noted that though "certain overt acts" prompted by religious beliefs or principles are not totally free from legislative restrictions, "[t]he conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order." Id. As in Sherbert, we discern no such threat as a result of Thomas' conduct.
The purpose of the Indiana Employment Security Act is to provide benefits "to persons *893 unemployed through no fault of their own." I.C. 22-4-1-1 (Burns Code Ed. 1974). Only in the most tortured sense may Thomas' unemployment be called his own "fault," for Thomas' only "fault" was belief in basic tenets of the Jehovah's Witnesses religion.
Thomas was specially hired into the roll foundry, to help produce non-military goods. When he was transferred to the turret line and became aware of the nature of his new work, he made every effort to find different work consistent with his religious beliefs. When he found that besides the now-defunct roll foundry, Blaw-Knox produced only military armaments, he requested a lay-off and asked to be re-hired should the foundry re-open. This request was denied and therefore Thomas felt compelled, according to his religious beliefs, to terminate his employment. Under these facts, he had no reason to investigate the products manufactured by the departments of Blaw-Knox other than the roll foundry. We intimate no view whether in a different case, under different factual circumstances, an employee may be obligated to make inquiry concerning the nature of some or all of the prospective or possible employment duties.
The Board contends that granting benefits under the circumstances at bar would constitute a violation of the Establishment Clause. This contention is not supported by citation of authority or by argument. See Ind. Rules of Procedure, Appellate Rule 8.3(A)(7). Nor does the Board attempt to distinguish or otherwise dilute the holding of Sherbert, which rejected a similar argument out-of-hand and without rationale or supportive reasoning:
"In holding as we do, plainly we are not fostering the `establishment' of the Seventh-day Adventist religion in South Carolina, for the extension of unemployment benefits to Sabbatarians in common with Sunday worshippers reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall. See School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560 [10 L.Ed.2d 844]." Id., 83 S.Ct. at 1797.
Sherbert's treatment of this issue has not escaped criticism.[5] Indeed, it has been pointed out that the Court had failed "to face up to the dilemma posed by the conflict between the Free Exercise Clause . . and the Establishment Clause..." Id., 83 S.Ct. at 1800 (Stewart, J., concurring in result).
Admittedly, the Sherbert decision in this respect, has some arguable increased precedential effect by having survived the fifteen years of its existence without specific judicial encroachment. We, nevertheless, feel compelled, in judicial conscience, to acknowledge the "dilemma" and to state our view of the present posture of the law in this regard.
Inviolability of conscience lies at the heart of the Free Exercise Clause,[6] while the Establishment Clause was bottomed on the notion that the federal government should be disabled from lending its power to that of the church.[7]
However, as government has broadened its scope of regulatory action, it has tended "to make majority notions into normative standards; enjoyment of benefits and *894 sometimes avoidance of penalties are conditional upon acceptance of [such] prevailing notions ..."[8] Though "[t]he majority standards thus `established' are not in common estimation religious[,] ... for some minorities they collide painfully with religious commands and prohibitions."[9] Because the State has entered the positive realm of allocating resources and "actively structuring the social order," the question of how different religious groups and interests should be treated is fundamentally different than that viewed from the perspective of the Framers.[10]
Indeed, the Framers probably did not appreciate the inner tension between the two clauses[11] which has developed into a struggle "to find a neutral course between the two Religion clauses, both of which are cast in absolute terms, and either of which if expanded to a logical extreme, would tend to clash with the other." Walz v. Tax Commission of City of New York (1970) 397 U.S. 664, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697. The need to accommodate the two clauses prompted the Supreme Court to state in the Walz case:
"The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." Id., 90 S.Ct. at 1411-1412. (Emphasis supplied).
The "strict neutrality" or "religion-blind" approach to the problem has been rejected. Instead the Court has apparently preferred to recognize that
"... government's actions impinge on different persons in dramatically different ways, so that truly evenhanded treatment at times compels exempting those whose religious beliefs are exceptionally burdened by a challenged state action. In this zone of required accommodation, the theory is that only an illusory and hostile neutrality would be achieved by pursuing a religion-blind constitutional ideal."[12]
Sherbert makes clear that "benevolent neutrality" may at times require government to take affirmative steps to remove barriers to the free exercise of religion[13] by making "special provision for religious interests in order to relieve them from both direct and indirect burdens placed on the free exercise of religion by increased governmental regulation."[14] The dominance of the Free Exercise Clause has thus been explained as "the natural result of tolerating religion as broadly as possible rather than thwarting at all costs even the faintest appearance of establishment."[15]
At least one commentator has suggested that Sherbert is an "aberration" and should not be followed.[16] This conclusion is premised upon the Supreme Court's holdings in United States v. Seeger (1965) 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 and Welsh v. United States (1970) 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308. These cases dealt with the selective service law's conscientious objector provisions. The statutory exemption was limited to those persons whose status arose from "religious training and belief," which the statute defined in terms of the objector's relation to a "Supreme *895 Being." The Court held that the exemption encompassed all those whose refusal to serve was based on a sincerely held moral objection. "A construction this strained," it is said, "is defensible only as a response to, and obviously was the product of, a desire to preserve the statute's constitutionality; ... the court ... was telling Congress that an exemption limited to religious objectors would probably violate the Establishment Clause. A fortiori, such an exemption should not be judicially compelled."[17] Therefore, it is argued that "[w]hatever authority Sherbert ever possessed has been drained by [the] Welsh [and Seeger] opinion[s]."[18]
It is readily observable that United States Supreme Court opinions dealing with the two Religion Clauses are very difficult to harmonize. However, the Welsh and Seeger opinions could themselves be seen as "aberrations," for they were written at the height of the Vietnam conflict. In any event, Sherbert has not been modified or overruled and remains a viable precedent to this day. Thus, Seeger and Welsh to the contrary notwithstanding, Sherbert must control the case before us. If the law is to be changed, it must be done by the United States Supreme Court. Our task is merely to apply the law as announced by that Court to the facts of cases involving federal constitutional questions.
Under the authority of Sherbert, we are compelled to hold that the disqualifying provision of I.C. XX-X-XX-X (Burns Code Ed. 1974), as it applies to Thomas, casts an impermissible burden on his First Amendment guarantee to the free exercise of his religion. Because the Board has conceded that no "compelling state interest" exists to justify such a burden, we must hold that the statute is unconstitutional as applied to Thomas.
The judgment is reversed and the cause remanded with directions that the Board enter an award not inconsistent with this opinion.
SHIELDS, J., concurs.
BUCHANAN, C.J., dissents with opinion.
BUCHANAN, Chief Justice, dissenting.
I must respectfully dissent.
My examination of the facts indicates to me that Eddie Thomas (Thomas) sought and received employment at Blaw-Knox Foundry and Machinery, Inc. (Blaw-Knox) ... a plant primarily engaged in producing weapons, which was an activity strictly forbidden by Thomas's religion.[1]
It is a finespun distinction indeed for a person with Thomas's religious convictions to justify working in a war plant because he was only involved with non-military goods. The Board found that "the claimant did not, knowing his special circumstances, seek out information concerning the Blaw-Knox company and its armament producing functions prior to his employment." The unmistakable inference is that he either knew or should have known[2] he was compromising his religious beliefs at the time he entered employment of this nature, and in my opinion, has waived his right to deny that his unemployment is due to personal reasons and not good cause.[3]
*896 And I interpret Sherbert v. Verner (1963), 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, relied on by the majority, to be consistent with this position.
Sherbert involved a Seventh Day Adventist whose employer switched to a six-day work week two years after she began work. Because this required work on Saturday, a practice forbidden by her religion, she was discharged. She was unable to find other work (due to her Saturday work restriction) and finally filed for unemployment benefits. That application was denied because of her refusal to accept other suitable work, a denial which the United States Supreme Court held to violate her First Amendment rights regarding the free exercise of religion.
The Sherbert decision, which specifically limited itself to its facts,[4] has been severely criticized.[5] At the time Sherbert accepted employment, her job did not contravene her religious beliefs. Only later, because of an unforeseeable change in work week by the company did a conflict arise. Thus, unlike Thomas, she did not voluntarily or carelessly place herself in a position in which she might have to chose between employment and religious principles.[6]
Similarly, the other case relied on by the majority, Lincoln v. True (W.D.Ky. 1975), 408 F. Supp. 22, involved a worker who, after taking acceptable employment, was forced to resign by changed circumstances beyond his control.[7]
Perhaps an even more troubling aspect of the decision in this case is that in safeguarding a claimant's right to "Free Exercise" of religion under the First Amendment, the court comes dangerously close to contravening the Establishment Clause of the same amendment. As Professor Ely wrote, "The course of action thus suggested by the Court  granting exemptions only to religious persons  is extremely suspect under the establishment clause: ... . My suggestion here, ..., is that judicial intervention is indicated only when there is proof that the choice (of the legislature) resulted from a desire comparatively to favor or disfavor a religion generally." 79 Yale L.J. at 1314, 1319. Impact alone, he concluded, should not trigger intervention.
Although the State may have a responsibility to make "special provision for religious interests in order to relieve them from both direct and indirect burdens placed on the free exercise of religion by governmental regulation," Gianella, Religious Liberty, Nonestablishment and Doctrinal Development. Part II: The Nonestablishment Principle., 81 Harvard L.Rev. 513, 518 (1968), that responsibility should not be extended to relieving a burden which is essentially one of the claimant's own making. The Free Exercise clause is not that elastic.
Thus it appears to me that the First Amendment pendulum has been swung by the majority out of its natural arc in the Free Exercise area into an unnatural arc in *897 the Establishment Area, and I would therefore affirm the Board's decision.
NOTES
[1] "[A]n individual shall be ineligible for [benefits] if it is determined that he voluntarily left his employment without good cause in connection with the work ..."
[2] The Religion Clauses of the First Amendment are applicable to the states through the due process clause of the Fourteenth Amendment. Cantwell v. Connecticut (1940) 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213.
[3] In so doing, the Court rejected the offered justification that fraudulent claims by persons feigning religious objections would dilute the unemployment compensation fund and that the administrative inconvenience resulting from an exemption would render the entire statutory scheme unworkable. Sherbert, supra, 83 S.Ct. at 1795-1797.
[4] This is not to say that the courts may subjectively inquire into the validity or rationality of the particular religious tenet or belief, as distinguished from an inquiry into the sincerity of the individual in espousing or seeking refuge in a particular "religious" belief or conviction. See United States v. Ballard (1944) 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148. See also, Sherbert, supra, 83 S.Ct. at 1795.
[5] See Weiss, "Privilege, Posture and Protection: `Religion' in the Law," 73 Yale L.J. 593, 620-623 (1964).
[6] Gianella, "Religious Liberty, Nonestablishment and Doctrinal Development. Part I: The Religious Liberty Guarantee," 80 Har.L.Rev. 1381, 1386 (1967). Indeed, "[t]he violation of a man's religion or conscience often works an exceptional harm to him which, unless justified by the most stringent social needs, constitutes a moral wrong in and of itself, far more than would the impairment of his freedoms of speech, press or assembly." Clark, "Guidelines for the Free Exercise Clause," 83 Har.L. Rev. 327, 337 (1969).
[7] Gianella, "Religious Liberty, Nonestablishment and Doctrinal Development. Part II: The Nonestablishment Principle," 81 Har.L.Rev. 513, 514 (1968).
[8] Galanter, "Religious Freedoms in the United States: A Turning Point?" 1966 Wis.L.Rev. 217, 268 (1966).
[9] Id.
[10] Gianella, Note 7, supra, p. 515.
[11] Gianella, Note 6, supra, p. 1389.
[12] Tribe, American Constitutional Law, § 14-4, p. 821 (1978). (Emphasis in original).
[13] Comment, 10 Vill.L.Rev. 337, 341 (1965).
[14] Gianella, Note 7, supra, p. 518.
[15] Tribe, Note 12, supra, § 14-7, p. 833.
[16] Ely, "Legislative and Administrative Motivation in Constitutional Law," 79 Yale L.J. 1207 (1970).
[17] Id., p. 1320.
[18] Id., p. 1322.
[1] Although the Review Board found the "roll foundry" division "was not engaged in the manufacture of items used in advancement of war," my examination of the record discloses little evidence to support such a conclusion.
[2] A worker might be able to fulfill his duty by clearly indicating possible religious prohibitions when applying for a job. However, merely indicating the denomination of his church does not fulfill that obligation.
[3] It might also be argued that Thomas was estopped from asserting his claim because he misled Blaw-Knox regarding his status as an employee. The elements of equitable estoppel as defined by Emmco Insurance v. Pashas (1967), 140 Ind. App. 544, 224 N.E.2d 314, are as follows:

(1) A representation or concealment of material facts; (2) The representation must have been made with knowledge of the facts [or with inexcusable negligence in finding the facts, Seymour Improvement Co. v. Viking Sprinkler Co. (1928), 87 Ind. App. 179, 161 N.E. 389]; (3) The party to whom it was made must have been ignorant of the matter; (4) It must have been made with the intention that the other party should act upon it; (5) The other party must have been induced to act upon it.
Additionally, an intent to deceive is not a requisite to allowing estoppel, but merely that the misled party was expected to rely upon the representations. Strafford v. Lane (1890), 124 Ind. 592, 24 N.E. 683.
[4] "Our holding today is only that South Carolina may not constitutionally apply the eligibility provisions so as to constrain a worker to abandon his religious convictions regarding the day of rest." 374 U.S. at 410, 83 S.Ct. at 1797.
[5] See Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970).
[6] Sherbert may also be distinguished because it involves a refusal to accept new work (See Ind. Code XX-X-XX-X) rather than "good cause for quitting," as is in the instant case (See Ind. Code XX-X-XX-X). The majority recognizes it applied a stricter standard in allowing benefits for the latter situation. See Gray v. Dobbs House, Inc. (1976), Ind. App., 357 N.E.2d 900.
[7] Lincoln had worked for Phillip Morris Corporation for 15 years when the ruling council for his Jehovah's Witness church decided it sinful to work with tobacco. Faced with a choice between expulsion from his church or loss of employment, Lincoln chose to quit his job. The Kentucky court, relying upon Sherbert, decided that unemployment compensation could not be denied upon this basis.