Eddie C. THOMAS, Appellant (Claimant)

v.

REVIEW BOARD OF the INDIANA EM-
PLOYMENT SECURITY DIVISION,
William H. Skinner, J. Frank Haley, and
Ralph Miles, as Members and as consti-
tuting the Review Board of Indiana Em-
ployment Security Division, and

Blaw-Knox Foundry & Machinery,
Inc., Appellees.

No. 2–1276A491—779S192.

Supreme Court of Indiana.

July 18, 1979.

Rehearing Denied Sept. 20, 1979.

Janet L. Jannusch, Gary, for appellant (claimant).

Theo. L. Sendak, Atty. Gen., Darrell K. Diamond, Asst. Atty. Gen., Indianapolis, for appellees.

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Court of Appeals. Appellant filed a claim for unemployment compensation stating that he voluntarily quit work because of religious convictions. After an initial determination by a deputy denying his claim, a hearing was held before an appeals referee on January 27, 1976. His decision of March 3, 1976 affirmed the determination of the deputy and included Findings and Conclusions denying Eddie C. Thomas' claim for unemployment compensation because he voluntarily left his employment without good cause in connection

with the work. The Employment Security Review Board affirmed the referee's decision and adopted, by reference, the referee's Findings and Conclusions. The Court of Appeals Opinion by Sullivan, J., Shields, J., concurring, reversed the judgment of the Review Board. Buchanan, C. J., dissented with opinion. *Thomas v. Review Board of Indiana Employment Sec.*, (1978) Ind.App., 381 N.E.2d 888.

The question presented for our review is whether the statute which made the claimant ineligible for unemployment benefits if he voluntarily left his employment without good cause in connection with the work, Ind.Code § 22–4–15–1 (Burns 1974), as it applies to Thomas, violates his First Amendment guarantee to the free exercise of his religion.

The record reveals that the claimant, Eddie C. Thomas, without seeking any information about the company, applied for employment at Blaw-Knox, a plant engaged primarily in the production of weapons. He was aided in obtaining the employment by his friend, a fellow church member, who worked in the roll foundry. The general foreman of the roll foundry had agreed to hire Thomas, so when he applied he was hired directly into the roll foundry. There was no exception made for him because of his religion. On his employment application he gave his religion as Jehovah's Witnesses and listed as hobbies Bible reading and Bible study. He stated no restrictions or conditions regarding his work on his application for employment.

Thomas had worked for Blaw-Knox for nearly a year when the roll foundry closed. He was then transferred to the turret line. He stated that on the first day he worked there as a chainman hooker, he realized what type of work he was doing, and that after checking the board where job openings were posted, he finally realized that "all of Blaw-Knox was armaments." He approached his friend, the other Jehovah's Witness, about the work situation and his friend said that he didn't find anything wrong with working there, and that he didn't view it as "unscriptural." The claim-

ant then inquired of other members of the congregation and stated that they agreed to make the decision of whether or not it would be unscriptural for him to continue working there. The record does not reflect whether or not this decision was made by them. The claimant did not seek a transfer because he said there were no other departments for him to work in. He asked for a lay-off, which was denied, and on November 6, 1975, he quit after working as a chainman for nearly a month, stating that continuing to work with armaments was against his religious principles.

The fact that Eddie Thomas decided that he could not, in good conscience, work at Blaw-Knox and that he quit voluntarily, does not require that this court declare that statute disqualifying him from receiving benefits unconstitutional as it applies to him.

"To strike down without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i. e., legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature."

*Braunfeld v. Brown*, (1961) 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563–568.

Under the Indian Employment Security Act, Ind.Code § 22–4–15–1 (Burns 1974) an individual "who has voluntarily left his employment without good cause in connection with the work" is disqualified from receiving benefits.

The public policy of this State in unemployment compensation is declared in Ind. Code § 22–4–1–1 (Burns 1974).

"Economic insecurity due to unemployment is declared hereby to be a serious menace to the health, morale and welfare of the people of this state and to the maintenance of public order within this state. Protection against this great hazard of our economic life can be provided in some measure by the required and systematic accumulation of funds during periods of employment to provide benefits to the unemployed during periods of unemployment and by encouragement of

desirable stable employment. The enactment of this measure to provide for payment of benefits to persons unemployed through no fault of their own, to encourage stabilization in employment, and to provide for a state employment service is, therefore, essential to public welfare; and the same is declared to be a proper exercise of the police powers of the state."

■ The purpose of this legislation is clear. It is to protect people from the menace of periods of unemployment and to encourage stable employment. It is not intended to facilitate changing employment or to provide relief for those who quit work voluntarily for personal reasons. Voluntary unemployment is not compensable under the purpose of the Act, which is to provide benefits for persons unemployed through no fault of their own. *Abshier v. Review Bd., Empl. Sec. Div.*, (1952) 122 Ind.App. 425, 430, 105 N.E.2d 902, cited in *Achenbach v. Review Board of Indiana Employment Security Division*, (1962) 242 Ind. 655, 179 N.E.2d 873.

■ Good cause which justifies voluntary termination must be job-related and objective in character. In *Geckler v. Review Bd. of the Ind. Emp. Sec. Div.*, (1963) 244 Ind. 473, 193 N.E.2d 357, the Indiana Supreme Court considered a claim by an employee who had voluntarily terminated her employment because of criticism by her employer when she "honestly" believed that it was impossible for her to continue in the employment. The question presented was whether such an employee would be considered to have terminated her employment for "good cause." The Court stated:

"As a general rule, the cases hold that "good cause", which justifies the voluntary termination of employment and entitles the claimant to compensation, must be related to the employment, and thus be *objective* in character. The cases have not extended the construction of "good cause" to include purely personal and subjective reasons which are unique to the employee, but have required that such "cause" would similarly affect per-

sons of *reasonable* and *normal* sensitivity."

*Id.*, 244 Ind. at 477–78, 193 N.E.2d at 359.

In the area of unemployment compensation, Indiana distinguishes between statutory "good cause" for quitting work "without good cause in connection with the work", and some valid personal reason. Neutral objective standards must be met to qualify for compensation.

■ In *Lewis v. Review Board*, (1972) 152 Ind.App. 187, 282 N.E.2d 876, the Court of Appeals determined that a claimant who had left work because of failing eyesight and a desire to be with his children before he became totally blind, had not quit work with "good cause" in connection with the employment within the meaning of the Employment Act. "Good cause" justifying termination of employment and entitling an employee to compensation must objectively relate to the employment and not to reasons personal to the employee.

■ In *Gray v. Dobbs House, Inc.*, (1976) Ind.App., 357 N.E.2d 900, the Court of Appeals discussed the distinction between "good cause" in a failure to apply "without good cause" for available suitable work, or to accept suitable work offered, and "good cause" involved when an employee *quits* work "without good cause in connection with the work." Parental obligations and transportation difficulties were held not to constitute "good cause" within the meaning of the claim of an employee who had voluntarily left her employment without "good cause" attributable to her employer. This means that a claimant who has terminated his employment must demonstrate that (a) his reasons for abandoning his employment were such as would impel a reasonable, prudent man to terminate under the same or similar circumstances; and (b) these reasons or causes are objectively related to the employment.

In *Gray, supra*, it was noted that although parental obligations no doubt constitute good personal reason for termination of employment, they nevertheless lack the objective nexus with employment envi-

sioned by the Act, which is required for one to qualify for benefits. The claim that transportation was not available without unreasonable expense, and that this fact constituted good cause in connection with the employment, was also rejected by the Court of Appeals, even though it could be good cause for refusing available work under Ind.Code § 22–4–15–2 (Burns 1974).

■ A stricter standard being applied to those who voluntarily quit work as compared to those who refuse available work seems to be in keeping with the intent of the legislature and the announced purpose of the Unemployment Compensation Act to avoid the menace of unemployment by encouraging people to maintain present jobs rather than to quit them. It allows employees to restrict or place necessary conditions upon their acceptance of new work, which would likewise encourage the maintaining of any new employment. This system appears to place responsibility for accommodation of any special considerations where it belongs, on the employee to make known to his prospective employer any special circumstances which will restrict his working. This system also avoids a detailed speculative inquiry by employers of applicant's personal beliefs, conditions or unique situations prior to hiring and avoids requiring an employer to pay money from his fund for compensation to an employee who voluntarily or carelessly places himself in a position where he will have to choose between quitting work or his personal beliefs. The finding and conclusion that the claimant voluntarily left his employment without good cause in connection with the work is correct. Thomas' reasons for leaving his employment were unique, personal and subjective. They were not objectively related to the employment.

"If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. *But if the State regulates conduct by enacting a general law within its power,*

*the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance . . . ."* (Emphasis added)

*Braunfeld, supra,* 366 U.S. at 607, 81 S.Ct. at 1148, 6 L.Ed.2d at 568.

The disqualifying statute imposes only an indirect burden, if any, on claimant's free exercise of his religion. It makes no religious practice unlawful. The State has enacted a general law, within their power, the purpose and effect of which is to advance the State's secular goals. Such a statute is valid.

■ Since Thomas is challenging the neutral disqualifying provisions of our statutes as they apply to him, we believe it is necessary to set out his statement of his ideas and beliefs and his objections to his continuing work. "A determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question." A personal philosophical choice rather than a religious choice, does not rise to the level of a first amendment claim of religious expression. *Wisconsin v. Yoder,* (1971) 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15, 25.

■ After the claimant was transferred from the roll foundry to the turret line he did not ask for another transfer. The hearing referee questioned him as follows:

"Q. Okay, because at that point you realized the entire plant was an armaments production.

A. The entire . . . that's correct.

Q. Engaged in armament production. All right.

A. That's correct.

Q. Which is against your religion beliefs, right?

A. That's true.

Q. To contribute to the armament production of the world.

A. That's correct.

Q. Is that correct?

A. That's correct.

Q. All right. Now, at the time you were working at the roll foundry you didn't realize that, right?

A. That . . .

Q. That it was part of an armaments procedure?

A. No, I did not."

This exchange indicates the entire plant, including the roll foundry, was part of an armaments procedure. Nevertheless, the claimant stated that he would have returned to the roll foundry to work. In an attempt to clarify claimant's position the referee asked:

"Q. Mr. Thomas, let me ask you this, getting . . . at the (inaudible) your convictions a little bit . .

A. Certainly.

Q. What if you were working for United States Steel or Inland Steel who produced steel, the raw product necessary for the production of any kind of a tank . . .

A. Mm-hum.

Q. And you found that that steel was being shipped to whoever . . .

A. Yes, for . . . for . . .

Q. . . . strictly for armaments purpose.

A. Yeah, I understand, strictly for armaments. Then I could continue to . . . to work for U.S. Steel or whatever steel maker or raw products or the . . . whatever producer it might be. I could still scripturally, you know, cause see the work for the . . . for the company . . . because it would . . . it would . . . it would . . . I would not be a direct party to whoever they shipped it to, you see, would not be . . . would not be chargeable in . . . according to my conscience to me, you know. But . . . . .

Q. Okay, is it the social atmosphere that makes a tank or is it the peo-

ple? I don't know. What's the difference whether you work for the steel producer that produces the steel or the coal company that produces the coal or the . . .

A. There . . . there you are.

Q. Or the . . . the company . . the chemical company that produces the saltpetre.

A. Or the actual . . . or what have you, you know, would . . the . . . the company that . . . .

Q. You . . . your . . . your expression is then that you . . finally you have to make a choice.

A. Yeah, you have . . . .

Q. And then when it comes to actually producing the tank itself, hammering it out; that you will not do that.

A. That's right, that's right. When I . . . when I'm daily faced with the knowledge that these are tanks . . . that these are tanks and . . . these was a couple other occurrences that really imprinted on my mind exactly where I was working, durin' those three or four weeks that I was working in . . within armaments. There was what they call it a bomb scare on two different occasions where we had to evacuate the work area. So . . .

Q. Go ahead.

A. I really could not, you know, conscientiously continue to to work with armaments. It would be against all of the . . . the . . . religious principles that . . . that I have come to learn and appreciate except up to that . . . up to this point."

The hearing referee concluded that the claimant, Eddie Thomas, had left work for religious reasons. The Review Board accepted this conclusion when it adopted the referee's Findings and Conclusions which are set out in the Court of Appeals opinion. The Court of Appeals, under the authority of *Sherbert v. Verner*, (1963) 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 held the disqualifying statute, Ind.Code § 22–4–15–1 (Burns 1974) to be unconstitutional as casting an impermissible burden upon Thomas' First Amendment guarantee to the free exercise of his religion. We disagree, grant transfer and affirm the Review Board's denial of unemployment benefits to the claimant.

Initially, we observe that there are significant differences between Thomas' situation and that involved in *Sherbert, supra.* In *Sherbert,* a Seventh Day Adventist was disqualified from receiving unemployment compensation when her refusal to work Saturdays, her Sabbath, caused employers to refuse to hire her and resulted in her being disallowed benefits because of her failure to accept suitable employment. The United States Supreme Court emphasized the general discriminatory effect of such a disqualification on Sabbatarians as compared to Sunday worshippers for whom it was provided that no employee would jeopardize seniority nor be discriminated against in any manner for refusal to work on Sunday.

The Court, in *Sherbert,* was careful to state that they did not declare the existence of a constitutional right to unemployment benefits on the part of all persons whose religious convictions are the cause of their unemployment, and specifically limited their holding as follows:

> "Our holding today is only that South Carolina may not constitutionally apply the eligibility provisions so as to constrain a worker to abandon his religious convictions respecting the day of rest.

*Id.,* 374 U.S. at 410, 83 S.Ct. at 1797, 10 L.Ed.2d at 974. The Court determined that a burden was placed on the free exercise of Sherbert's religion when her ineligibility for benefits derived "solely from the practice of her religion" and that the "pressure upon her to forego that practice was unmistakable" by forcing her to choose between following the precepts of her religion, remaining unemployed and forfeiting benefits or abandoning one of the precepts of her reli-

gion in order to accept work. This clear-cut choice of working on one's Sabbath or being unable to work at all was presented and the court found it to be an unconstitutional burden upon Sherbert's right to the free exercise of her religion.

In *Lincoln v. True,* (W.D.Ky.1975) 408 F.Supp. 22, also relied upon by Thomas, the claimant voluntarily terminated her employment of 21 years with a tobacco company because the elders of the Jehovah's Witnesses informed her that anyone using or working with tobacco products was violating the Will of God and unless she resigned she would be expelled from the fellowship of Jehovah's Witnesses. The District Court cited *Sherbert* as controlling and held that the denial of benefits violated the claimant's First Amendment right to the free exercise of her religion and ordered benefits to be paid.

The Court of Appeals opinions in *Thomas,* Ind.App., 381 N.E.2d 888, note the distinction in Indiana discussed previously in this opinion, of the standards involved in a voluntary quit case as compared to an availability for work case and the facts that distinguish *Sherbert* from *Lincoln.* We feel *Lincoln, supra,* improperly interpreted *Sherbert* to apply to Lincoln's situation and therefore do not rely on it here.

Thomas sought out work with Blaw-Knox and was hired. It appears from the record that all of Blaw-Knox was involved in the production of armamants. Thomas worked in the roll foundry and when transferred, worked on the turret line before he voluntarily quit his employment. He also expressed a willingness to return to work in the roll foundry if possible. It is not clear whether Thomas was voicing his objection to continuing work as a personal conviction, or if he were expecting his fellow church members to make this decision for him. It is not apparent that such a decision was ever made. There is no evidence that there was any pressure placed on Thomas, or on his fellow Jehovah's Witness, who continued to work at Blaw-Knox, to quit work. In Thomas' own words he was struggling to determine his position in this matter. He

was uncertain as to his precise beliefs and he was concerned about a bomb scare in the plant. This expression of his dilemma does not equal a violation of the kind of cardinal religious tenet at stake in *Sherbert,* involving work on one's Sabbath and the pressure to violate religious precepts or not to work at all.

Here, although the claimant's reasons for quitting work are described as religious, it is unclear what his belief was, and what the religious basis of his belief was. This situation is clearly distinguishable from our recent case, *Bureau of Motor Vehicles v. Pentecostal House of Prayer, Inc.,* (1978) Ind., 380 N.E.2d 1225, in which the Indiana Supreme Court found Ind. Code § 9–1–4–37(b) (Burns Supp.1977) to be an unconstitutional infringement of the Free Exercise clause of the First Amendment of the United States Constitution and of Art. 1 § 2 of the Indiana Constitution. That case involved a photograph requirement for the issuance of driver's licenses. It was clearly shown that the religious beliefs of the members were derived from a literal reading of the Bible and that the photographic requirement forced them to choose between violating an important religious principle or surrendering their driving privileges. It was held that to require a person to violate a cardinal tenet of his religion effectively penalized the free exercise of constitutional liberties.

In the area of free exercise claims, some broad areas of difference are apparent. The claims of those persons who refuse to perform positive action established by the state are different from the claims of those from whom benefits have been withheld. Claimant's objection to the enforcement of the statute in question as it applies to him is that he will be denied unemployment benefits because he voluntarily quit work for religious reasons. Thomas is not required by statute to violate a cardinal tenet of his religion. Our review of the record here reveals that the basis of claimant's belief is unclear. The precise belief is not articulated. He does not show how the exercise of his religious beliefs is hampered.

He is not prevented from seeking, being available for, or accepting new work. He is not deprived of benefits extended to others. *Sherbert* does not require that benefits be extended to this claimant. To so require would be an improper expansion of that holding.

In addition, in considering the basis for awarding or denying unemployment compensation we are also presented with the dilemma noted in the Court of Appeals opinions of the conflict between the Free Exercise Clause under the First Amendment and the Establishment Clause of the First Amendment.

As stated by the United States Supreme Court in *Gillette v. United States*, (1971) 401 U.S. 437, 449, 91 S.Ct. 828, 836, 28 L.Ed.2d 168, 180–81:

> "As a general matter it is surely true that the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion *or on religion as such*, or to favor the adherents of any sect or religious organization. . . . [T]he Establishment Clause stands at least for the proposition that when government activities touch on the religious sphere, *they must be secular in purpose, evenhanded in operation and neutral in primary impact*." (emphasis added)

Thomas does not ask that benefits be extended to him as they are to others, but that they be extended to him when they are denied to others. To hold that an employee who voluntarily quits work for personal reasons and personal beliefs which can somehow be described as religious beliefs, must be allowed benefits while other employees who voluntarily quit work for valid personal reasons or beliefs which are not "religious" are denied benefits, would violate the Establishment Clause of the First Amendment.

Transfer is granted, and the Court of Appeals opinion is vacated. The Board's decision that the claimant voluntarily left work without good cause in connection with the work and is not entitled to benefits is affirmed.

GIVAN, C. J., and PRENTICE, J., concur.

HUNTER, J., dissents with opinion.

DeBRULER, dissents with opinion.

HUNTER, Justice, dissenting.

In order to resolve the issue in the case at bar, it is not necessary to delve into Indiana law, including prior decisions of this Court and the Court of Appeals, regarding what does or does not constitute "good cause in connection with the work," Ind. Code § 22–4–15–1 (Burns Supp.1978), for one voluntarily terminating his employment. Respondent on transfer is not complaining that petitioner has acted improperly under the statute. Rather, the issue here is whether respondent, Eddie C. Thomas, was properly disqualified for unemployment benefits in light of his claim that this disqualification violates his First Amendment guarantee of free exercise of his religion.

The case of *Sherbert v. Verner*, (1963) 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, would appear to be controlling here. In that case a Seventh-Day Adventist was fired by her employer and thereafter refused other employment because of her refusal to work on Saturday, the Sabbath day of her faith. The South Carolina Employment Security Commission refused Sherbert unemployment compensation because of her refusal to work Saturdays.

In the instant case, Thomas, a Jehovah's Witness, quit his job with Blaw-Knox Foundry & Machinery, Inc. shortly after being transferred from the roll foundry to the turret line, an area of the plant directly involved in armaments manufacture. The referee, whose decision was adopted by the Indiana Employment Security Review Board, found that Thomas "did quit due to his religious convictions." *Thomas v. Review Board of Ind. Emp. Sec. Div.*, (1978) Ind.App., 381 N.E.2d 888, 890.

The majority opinion observes "significant differences" between Thomas's situation and Adell Sherbert's situation. The majority correctly notes that the United

States Supreme Court emphasized the general discriminatory effect of the disqualification in *Sherbert v. Verner, supra,* because South Carolina expressly saved "the Sunday worshipper from having to make the kind of choice which we here hold infringes the Sabbatarian's religious liberty." 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 971. To overemphasize this discriminatory factor is to miss the import of the *Sherbert* decision.

The *Sherbert* case did not turn on the discriminatory effect of the disqualification. The United States Supreme Court has noted that the *Sherbert*

"decision turned upon the fact that '[t]he ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.'" [citation omitted.] *McDaniel v. Paty,* 435 U.S. 618, 633, 98 S.Ct. 1322, 1331, 55 L.Ed.2d 593, 605. (Separate opinion by Brennan, J., in which Marshall, J., joined.)

The District Court in *Lincoln v. True,* (W.D. Ky.1975) 408 F.Supp. 22 made a similar conclusion and it is my belief that that case was properly decided. Thomas, Adell Sherbert and Ethel Lincoln, a Jehovah's Witness who quit her job with a tobacco company, where she had worked for twenty-one years, because of her religious convictions, were all forced to the same choice.

An inquiry by this Court into whether Thomas's convictions are religious would be improper in this case. As stated above, the facts as found by the referee, and as adopted by the Review Board, indicate that Thomas did indeed quit his job due to his religious convictions. Furthermore, this Court should not pick apart a religious adherent's beliefs because he is "struggling" with his position or because his beliefs are not eloquently stated. Neither should we distinguish between literal and interpretive readings of religious scriptures nor distinguish among so-called "cardinal tenets" of various religions.

I am cognizant of the limited nature of the decision in *Sherbert v. Verner, supra.*

"Our holding today is only that South Carolina may not constitutionally apply the eligibility provisions so as to constrain a worker to abandon his religious convictions respecting the day of rest." 374 U.S. at 410, 83 S.Ct. at 1797, 10 L.Ed.2d at 974.

In fact the high Court said:

"Nor do we, by our decision today, declare the existence of a constitutional right to unemployment benefits on the part of all persons whose religious convictions are the cause of their unemployment." 374 U.S. at 409–10, 83 S.Ct. at 1797, 10 L.Ed.2d at 974.

But in their next sentence the Court withdrew from that broad disclaimer.

"This is not a case in which an employee's religious convictions serve to make him a nonproductive member of society." 374 U.S. at 410, 83 S.Ct. at 1797, 10 L.Ed.2d at 974.

Like Adell Sherbert, Eddie Thomas was willing to work in a job which would not conflict with his religious convictions. He stated that he was willing to return to the Blaw-Knox roll foundry, which had been closed down precipitating his transfer. A reviewing court cannot say when and in what job a religious adherent compromises his beliefs as the dissent to the Court of Appeals decision in *Thomas, supra,* suggests. The fact that Thomas is willing to return to a neutral position at Blaw Knox no more diminishes his religious convictions than his willingness to work at another level in the military-industrial chain, such as a raw material supplier. Thus Thomas's religious convictions do not "serve to make him a non-productive member of society." *Sherbert, supra,* 374 U.S. at 410, 83 S.Ct. at 1797, 10 L.Ed.2d at 974. We are dealing here with a person's action pursuant to his religious beliefs, and cannot properly tell a litigant that he has misinterpreted his own beliefs.

Comments in the dissent to the Court of Appeals decision bring to mind Isaac Backus's admonition regarding religious intolerance in colonial Massachusetts in his com-

prehensive Appeal to the Public for Religious Liberty, written in 1773, a time of debate which fashioned our religious liberties.

> "Yes, some minorities are tolerated in Massachusetts; but some are not, and the procedure of deciding which are and which are not worthy of this privilege gives to a group of civil magistrates—a body which, since each man must speak for himself before God, cannot in the nature of things represent anyone in matters of religion—the power of passing judgment on 'the *springs* of their neighbors' actions.' You are condemned, he told the Massachusetts magistrates, out of your own mouths, for you say that England cannot in right tax beyond her own domain: "have we not as good right to say you do the *same thing*, and so that wherein you judge others you condemn yourselves?' " [Emphasis in original.][1]

Theologians have made similar statements indicating that living pursuant to religious convictions is a matter of individual conscience and not a response to objective, doctrinaire theory on which strangers—be they church elders, administrative referees or judges—may pass judgment.

> "[Religious] freedom means that all men are to be immune from coercion on the part of individuals or of social groups and of any human power, in such wise that in religious matters no one is to be forced to act in a manner contrary to his own conscience; *nor is he to be impeded from acting according to his own conscience*, whether privately or publicly, whether alone or in association with others, within due limits." [Emphasis added.][2]

> "A sense of dignity of the human person has been impressing itself more and more deeply on the consciousness of contemporary man, and the demand is increasingly made that men *should act on their own judgment*, enjoying and making use of a responsible freedom, not driven by coercion but motivated by a sense of duty." [Emphasis added.][3]

An individual in this nation should be free to seek religious truth and duty in a manner which accords with his or her nature and cannot be denied the benefits of public welfare legislation thereby.

The Court of Appeals decision in this case in no way fosters the establishment of the Jehovah's Witnesses religion in this state. It merely reflects "the governmental obligation of neutrality in the face of religious differences." *Sherbert v. Verner, supra,* 374 U.S. at 409, 83 S.Ct. at 1797, 10 L.Ed.2d at 974. The dissent in *Thomas, supra,* and the majority opinion here raise the same argument that was raised by Justice Harlan in his dissent in *Sherbert, supra,* which was specifically rejected by Justice Brennan's majority opinion.

For the foregoing reasons, I believe the opinion of the Court of Appeals should stand and would, therefore, deny transfer.

### ON PETITION TO TRANSFER

DeBRULER, Justice, dissenting.

Every working person who is covered by the Indiana Employment Security Act has it in his mind that he can expect either a paycheck *or* a benefit check to live on. Adell Sherbert's decision to refuse to accept a new job which would have required her to work on Saturdays, the day she and the church she belonged to regarded as a day to be set aside for rest and worship, removed her from the class having this dual expectancy. Eddie Thomas' decision to refuse to work at a new job for his employer which required him to participate directly in fabricating army tanks, because he and the church to which he belonged regarded such work as making one a direct party with those who would ultimately use the tanks,

---

**1.** Paraphrased in B. Bailyn, *The Ideological Origins of the American Revolution*, Belknap Press, Cambridge, Mass.1972, p. 266–267.

**2.** *Dignitatis Humanae*, No. 2, found in A.F.C. DeAlbornoz, *Religious Liberty*, Sheed & Ward, New York 1967, p. 12.

**3.** *Dignitatis Humanae*, No. 1, DeAlbornoz, *supra*, p. 15.

effectively removed him from the same class. Both were disqualified for benefits because of conduct dictated by their religious beliefs. The United States Supreme Court in *Sherbert v. Verner*, (1963) 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, held that Sherbert's disqualification as a beneficiary represented an abridgement of her right to the free exercise of her religion secured under the Free Exercise Clause of the First Amendment through the Fourteenth Amendment. I find no reason to conclude that Thomas should not be accorded the same constitutional protection for the free exercise of his religious belief. Salient here is the limitation which the Supreme Court placed upon its holding in *Sherbert* in the following passage:

"Nor do we, by our decision today, declare the existence of a constitutional right to unemployment benefits on the part of all persons whose religious convictions are the cause of their unemployment. This is not a case in which an employee's religious convictions serve to make him a nonproductive member of society." 374 U.S. at 409–10, 83 S.Ct. at 1797.

Both Sherbert and Thomas following the conduct dictated by their religious beliefs, remained ready, willing and available to work at a multitude of jobs. Sherbert was available to work at jobs which did not require Saturday attendance. Thomas was available to work at jobs which did not involve the production of armaments. Both were only temporarily in need of unemployment compensation and therefore clearly come under the Constitution's protective umbrella.